1:26-mc-00180

## CONTINUATION SHEETS FOR AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a white Toyota Camry with Pennsylvania registration LHV 8111 (the "VEHICLE"), further described in Attachment A, for the things described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Capital Area Resident Agency office located in York, Pennsylvania. I have been employed as a Special Agent with the FBI since 2021.

3.     I am currently assigned to investigate crimes against children including, but not limited to, child exploitation and child pornography offenses in violation of Title 18, United States Code, Sections 2251, 2252/2252A, 2422, and 2423. Additionally, I have been involved with investigations of violations of other federal statutes including Hobbs Act extortion, fraud, violent crime, online sexual exploitation, and kidnapping. As a Special Agent, one of my primary duties is the enforcement of federal laws and the security of government witnesses

and entities identified during the course of these investigations. I have been trained in conducting child exploitation investigations using digital and electronic techniques. I have had the opportunity to review numerous examples of digital evidence, conduct interviews with subjects, witnesses and victims, participated in the execution of many search warrants involving child exploitation offenses and have reviewed thousands of images of illegal Child Sexual Abuse Material ("CSAM") related to these investigations.

4.     As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

5.     This affidavit is based on my personal investigation and information provided by other law enforcement officers.  It is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## PROBABLE CAUSE

6.    On or about March 24, 2025, A 15-year-old female, MINOR VICTIM 1 ("MV1"), reported via 9-1-1 that she was a missing juvenile from Indiana.

7.    In response to the report, Officer Alex Raffensberger was dispatched to MV1's location. When he arrived, Officer Raffensberger found and spoke with MV1.

8.    MV1 told Officer Raffensberger that "this guy came out here and got [her]." According to MV1, a male drove to Indiana to pick her up, and then when she arrived in York, Pennsylvania "some crazy shit happened."

9.    MV1 proceeded to tell Officer Raffensberger that the male lived on Cider Street (later determined to be Cedar Street), which was where the male's "baby mom" lived. MV1 further explained that the residence was near a school with a big blue fence around it, referring to Lincoln Charter School.  MV1 identified the male as Jimel JOHNSON, age 35.

10.   Officer Raffensberger confirmed that MV1 was identified as a missing or runaway child since approximately March 1, 2025.  Officer Raffensberger then drove MV1 to the police station. As they traveled on West King Street, crossing South West Street, MV1 said that the residence was coming up. Officer Raffensberger turned down Cedar Street, and MV1 pointed out a residence close to West Newton Avenue. A parking lot was East of the residence.  MV1 said that she and JOHNSON would park there.

11.   At the police station, Officer Raffensberger briefly interviewed MV1. MV1 explained that JOHNSON added her on Snapchat, a social-media application that allows users to send and receive messages, pictures, and videos.  After adding MV1 on Snapchat, JOHNSON messaged MV1, telling MV1 that she was cute and asked if she had a boyfriend. They eventually began talking on Snapchat and FaceTime. JOHNSON told MV1 that he liked her, wished they lived closer together, and wished she was older.  They ultimately decided that JOHNSON should pick her up.

12. According to MV1, JOHNSON left Pennsylvania on the morning of March 1, 2025. He arrived in Indiana the same day, at around 6:00 p.m. From there, they slept in hotels and the car before returning to Pennsylvania.

13. On or about March 25, 2025, Officer Galen Detweiler of the York City Police Department was assigned to continue the investigation. He located and took a picture of a silver / gray Hyundai Sonata, North Carolina registration RHW 1109, parked on West Princess Street, just after Cedar Street. Officer Detweiler brought the photo to the minimal-facts interview held at the Youth Detention Center.

14. During the minimal-facts interview, MV1 disclosed that she met JOHNSON on Snapchat. MV1 also knew that JOHNSON's birthday was on March 5, 1990, and stated that JOHNSON knew she was 15 years old. With respect to their travel to Pennsylvania together, MV1 said they stayed in a hotel for the night before continuing to York. They then continued to York and slept in JOHNSON's car because the "baby mom" did not like MV1.

5

15.    During the interview, Officer Detwiler showed MV1 a picture of the Hyundai he photographed. MV1 identified it as JOHNSON's vehicle. She additionally identified a camouflage hat in the rear window deck of the car.

16.    License Plate Readers ("LPRs") in Ohio and Indiana captured the Hyundai traveling from Ohio into Indiana on March 1, 2025, between approximately 2:01 p.m. and 6:09 p.m. Additionally, LPRs in Indiana captured the vehicle on March 2, 2025, at approximately 9:55 a.m.

17.    While waiting for a truck to tow the Hyundai, Officer Detwiler saw blankets in the back seat and a small red bag on the floorboard. A picture showed JOHNSON sitting in a sedan wearing a grey TE Connectivity beanie. The same style beanie was in the rear window deck.

18.    According to records, the Hyundai was registered to Jimmy Pringle from North Carolina. On or about March 26, 2025, Officer Detwiler spoke with Pringle on the phone. Pringle said that he was the legal owner of the Hyundai and had given it to his son, JOHNSON. According to Pringle, he had received a call from JOHNSON saying that the Hyundai was missing.

6

19.    Officer Shawn Wilson of the York City Police Department subsequently located MV1 and JOHNSON's Facebook accounts.  He further discovered MV1's Snapchat username, "ufk.mia72."

20.    On the same date as the minimal-facts interview, Officer Detwiler obtained a search warrant for MV1's cell phone. When Officer Detwiler met with MV1 in an interview room, she expressed concern that JOHNSON was "on the run" and "got[] away with it."  MV1 proceeded to give Officer Detwiler the password to her cell phone and said that Officer Detwiler would see "lots of pictures and videos [that] she and [JOHNSON]" exchanged.

21.    On or about March 27, 2025, MV1 participated in a forensic interview.  During the interview, MV1 explained that she had been in York since March 2, 2025.  MV1 went on to explain that she started liking a guy she had met, traveled to York from Indiana, was in a relationship with JOHNSON, and things were "off and on."  According to MV1, she met JOHNSON online, and he asked if she wanted a relationship.  MV1 informed JOHNSON that she was only 15.  JOHNSON said he didn't care and continued communicating with MV1, including on FaceTime for about two weeks.  One day, they were on the phone and decided that MV1

should go on the run and stay with JOHNSON. JOHNSON agreed to travel to Indiana on a day that he didn't have to work. MV1 had a message from JOHNSON on that date, providing that he was on the way.

22. According to MV1, After JOHNSON picked her up, they stayed in a hotel in Elkhart, Indiana, where they had sex multiple times, before proceeding to York. When they got to York, MV1 stayed in JOHNSON's car while he was at work. At one point, JOHNSON's "baby momma," "Aisha," found out about MV1. She did not like that JOHNSON was with a younger girl. MV1 also spent time at the home of JOHNSON's "home boy." MV1 further helped JOHNSON watch his kids (ages 7 years and 10 months). JOHNSON told his "home boy" that he was going to jail. The "home boy" did not know that MV1 was 15. The only people who knew it were JOHNSON and Aisha. JOHNSON told MV1 to tell people that she was 18. Moreover, JOHNSON and MV1 had sex in JOHNSON's car, Aisha's home, and the "home boy's" house.

23. I reviewed the forensic examination from MV1's cell phone, an Apple iPhone. I found a Snapchat conversation between "mdot371spazzout" (MV1) and "nolovesincere" (JOHNSON). To that end, on March 1, 2025, MV1 sent JOHNSON a picture of a map in South Bend, Indiana. MV1 also sent the following message to JOHNSON: "Phillip 66 Lincolnway East Southbend In."

24. I additionally reviewed search warrant records provided by Snapchat, for username "nolovesincere." Those records associated the username with phone number (717) 476-5012. They further identified the occurrence of multiple video calls between JOHNSON and MV1, from February 26, 2025, to February 27, 2025. And during at least one communication with MV1, JOHNSON provided his phone number, (717) 476-5012.

25. As well, the Snapchat records for "nolovesincere" included the following CSAM:

    a. An 11 second video, created on or about February 24, 2025, depicting MV1 from the waist down, turning around, spreading her legs, bending over, and exposing her vagina and anus to the camera;

9

b.  Four videos of MV1 in a camouflage t-shirt, naked from the waist down and depicting MV1 spreading her legs, exposing her vagina, bending over, and inserting an object into her vagina;

c.  A four second video, created on or about February 24, 2025, showing MV1 wearing the same camouflage shirt, nude from the waist down, laying on her back with her legs open and inserting her fingers into her vagina;

d.  A video sent on February 23, 2025, showing MV1 exposing her vagina to the camera; and,

e.  A video sent on February 23, 2025, showing MV1 inserting an object into her vagina.

26.  Other files included a nine-second video of JOHNSON masturbating that JOHNSON sent to MV1 on or about February 23, 2025.

27.    Furthermore, according to the records provided by Snapchat, on or about February 20, 2025, JOHNSON engaged in a conversation with user "skyforevrtg."  Skyforevrtg indicated that she was 17 years old and lived in Pennsylvania. JOHNSON advised that he would be getting paid that day and was interested in pictures. During the discussion about purchasing pictures, JOHNSON stated "this sounds like a set up." JOHNSON then stated that he "likes white girls" and lived in York, Pennsylvania. The two discussed payment via Apple Pay. JOHNSON provided telephone number of (717) 476-5012, and the female indicated that she sent JOHNSON a text message.

28.    On March 4, 2026, a federal grand jury returned an indictment against JOHNSON, charging him with transportation of a minor with intent to engage in sexual activity and four counts of receipt of child pornography.

29.    During the investigation into JOHNSON, it also was determined that JOHNSON had a Cash App account with cash tag C_s9cdkpm6y.

11

30.    Cash App is a financial service application in the United States.  An individual can access Cash App through a web browser or through an application installed on a compatible mobile device.  Users can use Cash App to send and receive money.

31.    A lawfully obtained subpoena was served on Block, Inc., for Cash App records associated with Jimel JOHNSON.

32.    According to responsive records, JOHNSON made two payments to a minor-sponsored account (cash tag C_stea91mhk). The two payments were made on February 16, 2024 and February 17, 2024, and appeared to be consistent with payments for CSAM, in that, based on my training and experience, those transactions are often in small denominations, from approximately $5 to $20. Additionally, a February 17, 2024 transaction from JOHNSON to the minor-sponsored account had the comment "for my queen."

33.    Cash App offers "minor sponsored accounts." If someone is an eligible parent or guardian with a verified Cash App account, they can invite someone between the ages of 13 and 17 to use Cash App and access features like peer-to-peer transactions (including recurring allowance payments), Cash App Card, Cash App Pay, direct deposit, Boost, Bitcoin, and stocks. Once a person sponsors an account, the person becomes the legal owner of the sponsored account, and the person sponsored is considered an authorized user.

34.    Dajean Noland was the adult who sponsored the minor-sponsored Cash App account, C_stea91mhk.

35.    On or about July 2, 2025, I interviewed Noland, who advised that he made a Cash App account for a 14 or 15 year-old female who resided in York, Pennsylvania.

36.    JOHNSON was on probation, being supervised by York County Adult Probation Services. On or about February 19, 2026, I contacted JOHNSON's Probation Officer, Antwain Williams. According to Probation Officer Williams, JOHNSON's address was 542 W King Street, York, Pennsylvania. In February 2026, Probation Officer Williams met with JOHNSON at that address.

37. On March 6, 2026, the FBI arrested JOHNSON at the office of Probation Officer Williams. At that time, JOHNSON did not have a cell phone on his person. JOHNSON informed law enforcement that he did not bring a cell phone inside.

38. Simultaneous to JOHNSON'S arrest, the FBI executed a search warrant at JOHNSON'S residence, which authorized the search and seizure of electronic devices, including cell phones. Inside the VEHICLE that was parked outside the residence, law enforcement saw a cell phone in plain view.

39. The VEHICLE was registered to Ashiea Marshall, who resided with JOHNSON at the residence and was observed using a cell phone that was not the one seen inside the VEHICLE.

40. Marshall did not give consent to search the VEHICLE.

41. Because the VEHICLE was possibly beyond the scope of the search warrant for JOHNSON'S residence, the FBI towed the VEHICLE to its office lot at 3501 Concord Road, York, Pennsylvania, where the VEHICLE has remained secured.

42.    Based on my training and experience, including in the investigation of computer-related and child-exploitation crimes, I know the following:

    a. Electronic devices, including cell phones, are often connected to other devices through cloud storage.

    b. Individuals typically maintain their mobile devices near or on their person.

    c. Computers and computer technology have revolutionized the way in which CSAM is produced, distributed, and utilized. It has also revolutionized the way in which CSAM consumers interact with each other. CSAM formerly was produced using cameras and film. The photographs required darkroom facilities and a significant amount of skill to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The

distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

d. The development of computers has added to the methods used by CSAM collectors to interact with and sexually exploit children. Computers serve four functions in connection with child pornography. These are production, communication, distribution, and storage.

e. Cell phones and more advanced devices known as "smart phones" function the same as computers and can run computer software and applications, create and edit files, go on the Internet, chat, text, email, and interact with others on the Internet, and store, send, and receive files, among other functions. Cell phones and smart phones have been used by child pornographers and people with a sexual desire for children to send, receive, store, and produce images depicting CSAM, as well as engage in voice, email, text, and real time chat conversations with minors and other likeminded individuals. Cell phones and

16

smart phones can contain SD cards and/or SIM cards, as well as internal memory capabilities that can store data such as pictures, videos, text messages, contact lists, call logs and other data.

f. The advent of "smart" cellular phones equipped with cameras and internet capabilities has enabled child pornographers to broadcast live and recorded transmissions of sexual abuse of minors by connecting to the Internet.  A smartphone can access a variety of instant messaging applications, which permit real-time, direct, text-based communication between two or more people.

g. The computer's ability to store images in digital form makes the computer itself an ideal repository for CSAM. The computer's ability to store images in digital form makes the computer itself an ideal repository for CSAM. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store hundreds of thousands of images at very high

17

resolution. A single smart cellular device can store hundreds of images and thousands of pages of text. The size of the electronic storage media has grown tremendously within the last several years. Smart phone storage capacities of 32 and 64 gigabytes are common, and 128 and 256 gigabytes are available in high end models. It is possible to use digital cameras and "video" cameras (designed primarily to record moving images), including those contained in mobile telephones, to upload images to the Internet and be shared through applications on the phone/computer. Through forensic examination of electronic storage devices is it possible to recreate the evidence trail generated by this activity.

h. As with most digital technology, communications made from a computer, smart phone, or cell phone are often saved or stored on that device making the device a portable repository by which to store, transport, or distribute CSAM. Because of the portability of these devices, an

individual can possess said device on their person, at any time they are outside of their residence.

i. Global Positioning System ("GPS") devices can be portable devices used to obtain directions to destinations or show roads and directions in an area. GPS devices can store the route an individual traveled. GPS devices have been used by individuals to obtain directions when they travel to meet a minor for sexual purposes.

j. The ability to produce CSAM easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. CSAM can be transferred via electronic mail or through file transfer protocols ("FTP") to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (e.g., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of CSAM.

19

k. Consumers and distributors of CSAM also use online resources and applications to retrieve and store CSAM, including services offered by Internet Portals such as Google, Yahoo!, Hotmail, Sky Drive or One Drive, and Dropbox among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer or device, such as a cell phone or "smart phone", with access to the Internet. Even in cases where online storage is used, however, evidence of CSAM can be found on the user's computer devices in most cases.

l. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

43. I also know from my training and experience that the following characteristics are prevalent among individuals who consume child pornography:

  a. The majority of individuals who collect CSAM are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

  b. The majority of individuals who consume CSAM may collect explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals may also collect child erotica, which may consist of images or text that do not rise to the level of CSAM but which nonetheless fuel their sexual fantasies involving children.

c. The majority of individuals who consume CSAM and have a sexual interest in children may often seek out like-minded individuals, either in person or via the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, social media, applications, peer-to-peer, e-mail, bulletin boards, Internet relay chat, newsgroups, instant messaging, and other similar vehicles.

d. The majority of individuals who consume CSAM may maintain books, magazines, newspapers and other materials, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

23

e. The majority of individuals who consume CSAM often may collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or on scraps of paper.

f. Individuals who consume CSAM and have a sexual interest in children rarely, if ever, dispose of their sexually-explicit materials and may go to great lengths to conceal and protect their collection of illicit materials from discovery, theft, and damage. However, some individuals may dispose of their collection of their sexually-explicit materials or only seek them out when they want to view them in order to conceal their activities for fear of being caught.

24

25

g. Individuals who possess, receive, or produce CSAM often transfer these files between their different online accounts and electronic-storage devices, whether it is to conceal the files, to store them in one account or device versus another account or device, or to use in their communication with other child pornographers. I have investigated cases where individuals transfer CSAM files from one device, or account, or social media application to another. I have investigated cases where individuals store some or all of their CSAM collections in multiple electronic and storage devices.

h. Such individuals often maintain their CSAM in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. The CSAM is often maintained for several years and kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography and sexual materials, which are

valued highly. Some of these individuals also have been found to download, view, and then delete CSAM on their computers or digital devices on a cyclical and repetitive basis.

i. I know based on my training and experience in conducting these types of investigations that some individuals with sexual attraction to children will keep additional devices in their vehicles and frequently carry devices on their person in the form of cellular devices and other electronics which contain and have access to CSAM.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

39. As described above and in Attachment B, this application seeks permission to search for records that might be found in the VEHICLE in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

27

40.    *Probable cause.*    I submit that if a computer or storage medium is found in the VEHICLE, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

41.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the VEHICLE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB

flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia

of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other

31

evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on

the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

42. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of an area for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time during the search could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is

exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the VEHICLE. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

43. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

44.    Because at least JOHNSON and Marshall had access to the VEHICLE, it is possible that the VEHICLE will contain storage media that are predominantly used, and perhaps owned, by a person who is not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

45.    Furthermore, the warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

   a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric

37

features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

38

c.   If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's

39

contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that at least one digital device will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or

40

has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also

41

possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common or shared area without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.   Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is reasonably believed by

42

law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

46.    I submit that this affidavit supports probable cause for a warrant to search the VEHICLE described in Attachment A and seize the items described in Attachment B.

## ATTACHMENT A

*Property to be searched*

The property to be searched is a white Toyota Camry with Pennsylvania registration LHV 8111, in the custody of the Federal Bureau of Investigation, at 3501 Concord Road, York, Pennsylvania

## ATTACHMENT B

### *Property to be seized*

1.    All records relating to violations of 18 U.S.C. § 2423(a), transportation of a minor with intent to engage in a sexual activity, and 18 U.S.C. § 2252A(a)(2), receipt of child pornography, those violations involving Jimel JOHNSON and occurring after February 16, 2024, including:

      a.    Records and information relating to visual depictions of minors (persons under 18 years old) engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

      b.    Records and information relating to communications with minors (persons under 18 years old) about travel to engage in criminal sexual activity, that is, sexual activity for which a person can be charged with a criminal offense;

c.  Records and information relating to communications with minors (persons under 18 years old) about the production, distribution, or receipt of child pornography as defined in Title 18, United States Code, Section 2256.

d.  Records and information relating to communications with persons 18 years and older about visual depictions of minors (persons under 18 years old) engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

e.  Records and information relating to communications with any person 18 years and older about travel with a minor (a person under 18 years old) to engage in criminal sexual activity, that is, sexual activity for which a person can be charged with a criminal offense;

f.  Records and information relating to Snapchat username "nolovesincere";

g.  Records and information relating to phone number (717) 476-5012;

2

h.    Records and information relating to internet browser history; and,

j.    Records and information relating to travel with or to meet a minor (a person under 18 years old), with intent to engage in a criminal sexual activity with said minor.

2.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

3

b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the lack of such malicious software;

d.    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.    evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.    evidence of the times the COMPUTER was used;

4

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and,

m.  contextual information necessary to understand the evidence described in this attachment.

5

3.    As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disk drives or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

6

4.      Law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual reasonably believed by law enforcement to be a user of a device found in the VEHICLE, to the fingerprint scanner of the device; (2) hold a device found in the VEHICLE in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

5.      This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7